UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | | |
|---|---|---|---|
| RUSSELL J. LONG, | ) | | |
| | ) | | |
| Plaintiff, | ) | | |
| | ) | | |
| vs. | ) | Case No. | 4:07CV2111 JCH/AGF |
| | ) | | |
| MICHAEL J. ASTRUE, | ) | | |
| Commissioner of Social Security, | ) | | |
| | ) | | |
| Defendant. | ) | | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Russell J. Long was not entitled to disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income ("SSI") under Title XVI of the Act, id. §§ 1381-1384f. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and the case be remanded for the Administrative Law Judge to redetermine the date of onset of Plaintiff's disabling mental impairments and to provide reasons for the date assigned.

Plaintiff, who was born on January 12, 1960, filed an application for SSI on November 9, 2005, at the age of 45. Plaintiff filed an application for DIB on March 7, 2007. Plaintiff alleged a disability onset date of October 29, 2005, for SSI and September

29, 2004, for DIB, both due to back problems, lack of upper body strength, fused vertebrae in neck, anxiety, and depression. In a letter dated February 2, 2006, Plaintiff amended the alleged onset date to December 31, 1999, or the date he was last insured, whichever was earlier. After Plaintiff's applications were denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was held on March 28, 2007. In a June 19, 2007 decision, the ALJ concluded that Plaintiff was disabled from mental impairments, including general anxiety disorder, recurrent major depressive disorder, and agoraphobia, since, but not prior to, July 18, 2005. The ALJ's decision entitled Plaintiff to SSI but not DIB because the July 18, 2005 onset date was subsequent to the expiration date of Plaintiff's insured status. Plaintiff requested review by the Appeals Council of the Social Security Administration, submitting additional evidence to the record. The request for review was denied on November 9, 2007. Plaintiff has therefore exhausted all administrative remedies and the ALJ's decision stands as the final agency action now under review.

Plaintiff argues that the ALJ's findings are not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ erred by establishing a disability onset date based on the date on which Plaintiff sought mental health treatment, rather than when Plaintiff's impairments began to prevent him from performing substantial gainful activity. Plaintiff argues that the ALJ should have obtained the services of a medical advisor for assistance in inferring the onset date of Plaintiff's mental impairments. Plaintiff further argues that the ALJ erred in giving only little weight to the

opinion of Plaintiff's treating psychiatrist (Karen Cowan, M.D.) with respect to the period prior to July 18, 2005.

**<u>Work History</u>**

Plaintiff's earnings record shows that he earned approximately $10,000 annually in 1985 and 1986, and approximately $30,000 annually from 1987 through 1997. In 1998 he earned approximately $9,000, and in 1999 he earned approximately $3,000. The record indicates that during all of these years, Plaintiff worked as a truck driver for a grocery chain until an on-the-job injury on January 12, 1998, when he fell on ice as he was getting out of his truck.

**<u>Medical Record</u>**

Plaintiff's arguments before the Court relate to his mental impairments, and so the Court's review of the medical record will focus on those impairments. Briefly with regard to his allegations of physical impairments, following his July 1998 accident, Plaintiff experienced neck, shoulder, and arm pain and numbness, for which Plaintiff began treatment with David Kennedy, M.D. On July 6, 1998, Dr. Kennedy performed cervical microdiscectomy surgery to complete a fusion. <u>Id.</u> at 603-15.

In September 2003, Plaintiff sought assistance through the Missouri Division of Vocational Rehabilitation ("DVR"). He noted problems with mobility of his neck and inability to lift anything above his waist. The DVR found Plaintiff eligible for services and classified him as an individual with significant disability, with the primary disability being orthopedic/neurological, and no secondary disability noted. <u>Id.</u> at 177-81.

On October 7, 2003, Plaintiff's mother visited a VA clinic to express her concern about her son experiencing depression. She reported that he was unemployed and living at home with her and that he had previously lived in his truck. Plaintiff's primary care physician at the clinic, staff physician Lawrence Schacht, M.D., called Plaintiff the same day and told him about his mother's concerns. Plaintiff responded that he was fine and that his mother was "in her own little world." Dr. Schacht noted that Plaintiff seemed pleasant, calm, and appropriate. Id. at 406-07.

On a DVR health assessment questionnaire completed on August 16, 2003, Plaintiff indicated in checkbox format that he did not have depression or other emotional disorders. Id. at 189. A DVR report of contact dated May 6, 2004 stated that Plaintiff would be taking three credit hours at a community college in that summer, and was advised that he could apply for SSI disability benefits at any time. Id. at 150. The record indicates that in the summer of 2004, Plaintiff took one class at a community college, and had signed up for 17 credit hours for the fall 2004 semester. Id. at 194-196.

On September 3, 2004, Plaintiff went to the VA clinic complaining of bad heartburn several times a week. He reported that he had a history of depression and agoraphobia, for which he had never taken medication or had counseling. He stated that a few years ago he was afraid to leave the house but that he was currently much better and felt no need for medication. Id. at 402. A DVR memo dated February 2, 2005, stated that Plaintiff had no wages and had applied for unemployment benefits "last year." Id. at 131.

On July 18, 2005, Plaintiff presented to the VA clinic seeking help for depression which he stated was "long term." He reported that he had no desire to get out of bed and that he had made a suicide attempt one year ago. Plaintiff said his girlfriend encouraged him to get help, and that he had never taken medication for depression. Id. at 401. It was as of this date that the ALJ determined that Plaintiff was disabled due to his depression and agoraphobia.

Plaintiff began treatment with psychiatrist Karen Cowan, M.D., at the VA on July 27, 2005. He reported that he had had no psychiatric symptoms until he was injured at work (in 1998). Following the injury, he had financial and personal setbacks and experienced an onset of severe depressive and anxiety symptoms. He was unable to leave his home and had made two suicide attempts. Plaintiff had had no psychiatric intervention until currently when he felt the recurrence of his depressive symptoms. Dr. Cowan diagnosed Plaintiff with major depression, recurrent, severe; agoraphobia with panic; and a Global Assessment of Functioning ("GAF") score of 45.[1] She prescribed Celexa (an anti-depressant) and Visteril (used to treat anxiety). Id. at 394-400.

At subsequent visits with Dr. Cowan, Plaintiff reported only mild improvement

---

[1] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; and scores of 61-70 indicate "mild" impairment.

and Dr. Cowan continued to increase and adjust Plaintiff's medications.  Dr. Cowan completed a Mental Medical Source Statement on November 30, 2005, in which she diagnosed major depression, recurrent and severe; and agoraphobia with panic disorder. Dr. Cowan described Plaintiff as moderately to extremely impaired in activities of daily living, social functioning, and concentration, persistence and pace; extremely impaired in his ability to cope with normal work stress, behave in an emotionally stable manner, understand and remember simple instructions, complete a normal workday and workweek without interruptions from symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods.  Dr. Cowan opined that Plaintiff had suffered a substantial loss in several basic areas of work-related functioning.  She opined that Plaintiff had had four or more episodes of decompensation in the past year.  Dr. Cowan noted Plaintiff's limitations had lasted or could be expected to last 12 months at the assessed severity.  Finally, Dr. Cowan opined that Plaintiff's limitations at the severity she assessed began in 1998.  Dr. Cowan noted that Plaintiff's most recent, as well as highest, GAF score was 49 and that his lowest GAF in the previous year was 45. Id. at 207-10.

On August 23, 2005, Plaintiff saw psychologist Frederic Metzger, Ph.D.  Plaintiff reported that he had responded to multiple psychiatric stressors (loss of job, neck injury, bankruptcy, divorce) by isolating himself.  Dr. Metzger noted that Plaintiff apparently had spent nearly two years in seclusion.  Id. at 386-88.  On October 16, 2006, John Emmons, D.O., examined Plaintiff and diagnosed Plaintiff with major depressive

6

disorder, dysthymia (a mood disorder), and generalized anxiety disorder.  Id. at 325.

Plaintiff was hospitalized on January 7, 2007, for five days after attempting suicide by taking 250 Valium and cutting his wrists and neck.  The medical records note that Plaintiff had a history of depression since 1998, when he incurred a neck injury and lost his job, and had since been depressed.  The records note that Plaintiff had tried to hurt himself two or three times by taking overdoses or cutting his wrists.  Plaintiff was diagnosed with major depression - recurrent without psychotic features.  Plaintiff was assigned a GAF of 25, with his highest GAF assessed at 55.  Id. at 418-20.

In progress notes dated January 19, 2007, Dr. Schacht (Plaintiff's primary care physician) opined that Plaintiff was permanently medically incapacitated by his psychiatric problems.  Id. at 563.

**Evidentiary Hearing of March 28, 2007**

Plaintiff, who was represented by counsel, testified that he was 47 years old and had been living at the house of a friend, Cherie Johns, for a couple of years since losing his own house in foreclosure.  Plaintiff testified that his last date of employment was at the beginning of 1998.  He then filed for disability benefits and food stamps, and he received worker's compensation.  Plaintiff noted that he received most of his medical treatment through a VA hospital.  He had been in the military from 1981 until 1984, receiving an honorable discharge.  Id. at 770-71.

Plaintiff testified that he graduated from high school and took "a couple of" college courses as part of a vocational rehabilitation program, but he became

7

overwhelmed and stopped attending classes. Plaintiff testified that he had worked as a mechanic, then as a tow truck driver for a couple of years, and then as a tractor trailer driver from 1985 until 1998 when he injured himself, falling on his back. Medical care following the injury included the pinning of three of Plaintiff's vertebrae with his neck. Id. at 771-73.

Plaintiff stated that his back "goes out" a lot, but that he was afraid to have back surgery, and that a lot of his pain was likely the result of lying on it wrong. Plaintiff continued to have neck pain as well as stiffness in his back and neck, and he got kinks in his back when he slept. Plaintiff was not taking medication regularly for these problems, but he did take hot showers. Plaintiff stated that in addition, he no longer had use of his biceps, and in order to lift something, he had to "swing stuff up" with both hands. Plaintiff testified that he could sit for six hours straight in a comfortable chair, and could stand for ten to fifteen minutes before his back started to bother him. Plaintiff testified that on a normal day, he would often lie in bed and watch TV for most of the day. He was not certain of the distance that he could comfortably walk, he was able to lift a gallon of milk with two hands only, and he likely would not be able to lift a gallon continuously for two hours. Id. at 773-76.

When asked about his mental condition, Plaintiff said that immediately following the accident in 1998, his mental state was not bad, but by the end of 1999 or beginning of 2000 he was unable to go outside. He went years before seeing a psychiatrist, but for the past two years was seeing Dr. Cowen. Plaintiff said that anxiety caused him to grind his

teeth, breaking every tooth in his mouth, and that he needed dentures as a result. He was taking medication for his emotional problems, but the medication changed regularly. He continued to have feelings of panic and anxiety, as well as agoraphobia, and while he tried to force himself to go to the store, he always waited for his friend, Johns, to get home before leaving the house. Plaintiff stated that Johns forced him to get out of the house occasionally. Id. at 776-78.

Plaintiff testified that being around people caused him anxiety, and that he did not answer the phone half the time. He was being treated for depression and had attempted suicide, most recently in January 2007, once in 2004, and once in 2006. Plaintiff said that he currently had regular thoughts about suicide. His concentration was not good. He repeated that on a typical day he stayed in his bedroom and watched TV. He never went outside to socialize. Plaintiff stated that people did not come visit him very often and that he was no longer good at taking care of his hygiene, though Johns made him take showers a couple times a week. Plaintiff said that Johns had to remind him to do chores around the house. Id. at 778-81.

Plaintiff said that he received a workers' compensation settlement in the amount of $44,000 and that his disability was rated as 40 percent of his body as a whole. Plaintiff said that he had not tried working after his injury. He stated that he took one class in the summer of 2004, and tried carrying a full course load in the fall semester, but "just couldn't make it" for more than two days. He usually woke up at 6:00 when Johns went to work, and then went back to bed where he stayed, falling asleep on and off, and

9

watching TV. He was in a support group and saw Dr. Cowen at least once a month, or possibly twice a week if things got bad. Id. at 781-83.

**ALJ's Decision of June 19, 2007**

The ALJ determined that Plaintiff's last date of insured status was September 30, 2004. The ALJ found that Plaintiff had a history of cervical fusion prior to July 2005, but that this impairment was not severe for twelve months. The ALJ then found that "more recently," Plaintiff had a generalized anxiety disorder, agoraphobia, and a recurrent major depressive disorder, but that these impairments had never met or equaled in duration or severity the criteria established in the Commissioner's regulation for deemed-disabling impairments. Thus, the ALJ turned to consider whether Plaintiff's impairments precluded the performance of past relevant work or other work. Id. at 15.

The ALJ recognized that Plaintiff's subjective complaints were to be evaluated in accordance with the factors set forth in Polaski v. Heckler, 739 F.2d 1320, 1321-22 (8th Cir. 1984). The ALJ found that the Plaintiff failed to establish evidence of a severe impairment imposing significant limitations, lasting twelve months in duration and through 2003. The ALJ acknowledged that Plaintiff was diagnosed with cervical radiculopathy with mild residual right upper extremity weakness. But, the ALJ found that this evidence was inconsistent with Plaintiff's allegations of severe symptoms. Id. at 17.

With regard to Plaintiff's mental impairments, the ALJ stated that in September 2003 Plaintiff denied that he received any treatment for any psychiatric complaint over the prior two years. The ALJ further noted that in September 2004 Plaintiff reported that

10

he had a prior history of depression and agoraphobia, but that he did not need prescription drugs then or now. The ALJ found that the Plaintiff's allegations of disability prior to July 18, 2005, were not credible. The ALJ noted that for the 12 months prior to July 2005, the medical records did not document that any treating physician had ever found or imposed any long term and significant mental or physical limitations upon Plaintiff's functional capacity. Id. at 18-19.

Moreover, the ALJ did not find that Plaintiff's allegations of severely limited daily activities were credible. The ALJ noted that in January 2006 Plaintiff reported no problems walking, paying attention, following written and oral instructions, driving a car, leaving home by himself, cooking, or performing personal care activities. The ALJ stated that a vocational rehabilitation report dated February 2, 2006, noted that Plaintiff had applied for unemployment benefits the previous year, which was inconsistent with Plaintiff's allegations of disability because an individual receiving unemployment benefits must be ready, willing, and able to work. In fact, as noted above, this DVR memo actually was dated February 2, 2005 (id. at 131), and accordingly referred to Plaintiff seeking unemployment benefits in 2004. Id. at 19-20.

The ALJ noted that the Plaintiff attended community college in the summer and fall of 2004, and was in good standing and taking 17 credit hours in the fall of 2004. The ALJ referred to the May 6, 2004 vocational rehabilitation report that while Plaintiff was preparing to take college classes, he was motivated to apply for disability benefits because of financial difficulties beyond any alleged disability. The ALJ concluded that,

11

even granting the Plaintiff some credibility for a steady work history prior to 1998, Plaintiff's allegation of four different onset dates (September 29, 2004, October 29, 2005, December 31, 1999, or the date last insured whichever was earlier), undermined Plaintiff's credibility with respect to his onset date and with respect to the severity of his symptoms. Id. at 20.

The ALJ found that the record failed to establish that Plaintiff could not perform at least sedentary work prior to July 18, 2005, which necessitated a finding of not disabled during that period. The ALJ gave little weight to Dr. Cowan's November 30, 2005 assessment, because, according to the ALJ, the findings were based upon mental impairments and limitations not reflected in the record prior to July 2005. The ALJ stated that because Plaintiff was not disabled prior to the expiration of his insured status on September 30, 2004, even if he was currently disabled he was not entitled to DIB. Id. at 20. Based on the evidence related to the period after July 2005, including Dr. Schacht's January 19, 2007 report indicating that Plaintiff was permanently medically incapacitated by his psychiatric problems, the ALJ found that the Plaintiff suffered from disabling major depressive disorder and a generalized anxiety disorder with agoraphobia since July 18, 2005. Id. at 22-23.

## DISCUSSION

**Standard of Review and Statutory Framework**

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by

substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (citation omitted). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001) (citation omitted)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995) (citation omitted)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment

13

is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the deemed-disabling impairments listed in the Commissioner's regulations. If not, the Commissioner asks at step four whether the claimant has the RFC to perform his past relevant work, if any. If the claimant has past relevant work and is able to perform it, he is not disabled. If he cannot perform his past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as depression, the Commissioner cannot carry this burden by relying exclusively on the

Guidelines, but must consider testimony of a vocational expert on whether there are jobs in the economy which a person with the claimant's vocational profile could perform.

**<u>Disability Onset Date</u>**

Plaintiff argues that the ALJ erred as a matter of law in assigning an onset date for Plaintiff's psychiatric disability as the date that Plaintiff sought treatment. Plaintiff cites DSM-IV at 356, 376, as establishing that a patient cannot be diagnosed with recurrent major depression until he has suffered from it for a minimum of three months, and as defining dysthemia for diagnostic purposes as a mood disorder of at least two years duration. Plaintiff points to Dr. Emmons' October 16, 2004 diagnosis of dysthemia as evidence of an onset date earlier than July 18, 2005.

Plaintiff further argues that the absence of treatment or belittling of symptoms of mental disorders by a patient is not evidence of the lack of severity of these disorders. He faults the ALJ for relying on the fact that Plaintiff had registered for a full course load in the fall of 2004, whereas the evidence was that Plaintiff dropped out after two days because he could not handle it. Plaintiff also faults the ALJ for giving little credit to Dr. Cowan's opinion (that his disabling mental limitations began in 1998), and argues that the ALJ should have consulted with a medical advisor to ascertain the disability onset date, in accordance with Social Security Ruling "(SSR") 82- 20.

The Commissioner argues that the absence of treatment prior to July 18, 2005, for Plaintiff's mental health issues indicates that the impairment was not severe before that date. The Commissioner points to Plaintiff telling Dr. Schacht on October 7, 2003, that

15

he was doing fine; indicating only physical restrictions on the August 16, 2003 vocational rehabilitation questionnaire; and enrolling for 17 credit hours at community college for the fall 2004 semester. The Commissioner argues that there was no credible evidence of any sufficiently severe functional limitations which would support a finding of disability prior to July 2005, and that it was not necessary for the ALJ to consult a medical advisor on the matter.

Upon review of the record, the Court believes that Plaintiff's arguments are well taken. SSR 83-20 sets forth guidelines for determining the onset date of disability. It explains, in relevant part, as follows:

> In addition to determining that an individual is disabled, the decisionmaker must also establish the onset date of disability. In many claims, the onset date is critical; it may affect the period for which the individual can be paid and may even be determinative of whether the individual is entitled to or eligible for any benefits. In title II worker claims, the amount of the benefit may be affected; in title XVI claims, the amount of the benefit payable for the first month of eligibility may be prorated. Consequently, it is essential that the onset date be correctly established and supported by the evidence.
>
> *   *   *
>
> In some cases, it may be possible, based on the medical evidence to reasonably infer that the onset of a disabling impairment occurred some time prior to the date of the first recorded medical examination, e.g., the date the claimant stopped working. How long the disease may be determined to have existed at a disabling level of severity depends on an informed judgment of the facts in the particular case. This judgment, however, must have a legitimate medical basis. At the hearing, the administrative law judge (ALJ) should call on the services of a medical advisor when onset must be inferred.
>
> *   *   *

16

> The available medical evidence should be considered in view of the nature of the impairment (i.e., what medical presumptions can reasonably be made about the course of the condition). The onset date should be set on the date when it is most reasonable to conclude from the evidence that the impairment was sufficiently severe to prevent the individual from engaging in SGA (or gainful activity) for a continuous period of at least 12 months or result in death. Convincing rationale must be given for the date selected.

SSR 83-20 at 2-3, 1983 WL 31249, at *1, 3.

Pursuant to this regulation, a medical advisor needs to be called if the evidence of onset is ambiguous. Grebenick v. Chater, 121 F.3d 1193, 1201 (8th Cir. 1997); Schmick v. Astrue, No. 1:07CV69 HEA, 2008 WL 4402204, at *14-15 (E.D. Mo. Sept. 24, 2008) ("The date of diagnosis of the impairment is not necessarily equivalent to the onset date of disability."); Westbrook v. Astrue, No. 4:06 CV 997 DDN, 2007 WL 5110314, at *9 (E.D. Mo. Aug. 9, 2007).

The Court believes that this is a case in which the evidence of onset is ambiguous. Further, as noted above, the ALJ erred as to the year in which Plaintiff sought unemployment benefits. And the ALJ's reliance on Plaintiff being in good standing for a full course load in the fall of 2004 is problematic in light of Plaintiff's uncontroverted testimony that he dropped out of school after two days. In addition, the lack of treatment for a mental disorder does not always prove that a disabling condition did not exist. Stanfield v. Chater, 970 F. Supp. 1440, 1460 (E.D. Mo. 1997).

## **CONCLUSION**

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** under sentence four of 42 U.S.C. § 405(g) for the ALJ to redetermine, with the assistance of a medical advisor, the date of onset of Plaintiff's disabling mental impairments and to provide specific findings and appropriate rationale to support this determination.

The parties are advised that they have ten (10) days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 25th day of February, 2009.